**NATIONAL MEDICAL ENTERPRISES, INC., Doing Business Through Various Wholly–Owned Hospital Subsidiaries, Plaintiff–Appellee,**

v.

**Louis W. SULLIVAN, M.D., Secretary of Health and Human Services, Defendant–Appellant.**

No. 89–55859.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 10, 1990.

Decided Oct. 10, 1990.

Anthony J. Steinmeyer, Dept. of Justice, Civ. Div., Washington, D.C., for defendant-appellant.

Patric Hooper, Hooper, Lundy & Bookman, Inc., Los Angeles, Cal., for plaintiff-appellee.

Before NELSON, NORRIS and O'SCANNLAIN, Circuit Judges.

WILLIAM A. NORRIS, Circuit Judge:

This case involves the claims of eighteen hospitals ("Providers") seeking Medicare reimbursement for stock maintenance costs incurred by their corporate owner, National Medical Enterprises ("NME"), during the fiscal years 1974 to 1979. The costs in dispute include stock transfer agent fees, stock and exchange registration fees and costs attributable to SEC filings, stockholder meetings, annual reports to stockholders, and institutional public relations relat-

ed to stock and financial matters. The Secretary of Health and Human Services ("Secretary") ruled that, pursuant to Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq., known as the "Medicare Act", and internal agency regulations, stock maintenance costs were not reimbursable expenses. NME sought judicial review of the Secretary's decision in the United States District Court for the Central District of California on behalf of its eighteen wholly-owned subsidiaries. After considering cross motions for summary judgment, the court ruled that the Secretary had no rational basis for denying the subsidiaries reimbursement and granted summary judgment for plaintiff-appellee. The Secretary timely appeals the district court's decision. We reverse.

## I

Under the Medicare Act, providers are entitled to reimbursement for reasonable costs "necessary in the efficient delivery of needed health services" to Medicare patients. 42 U.S.C. § 1395x(v)(1)(A) (1988). Agency regulations established to implement the statutory mandate stipulate that the costs must be "necessary and proper," 42 C.F.R. § 405.451(b) (1985) (redesignated as 42 C.F.R. § 413.9(b) and "directly or indirectly related to patient care." 42 C.F.R. § 405.451(c) (1985) (redesignated as 42 C.F.R. § 413.9(c)).

In a previous action, NME and three of its subsidiary hospitals sought reimbursement for NME's stock maintenance costs during fiscal 1973. The Claims Court held that the Secretary had improperly denied reimbursement because, it said, stock maintenance costs were reasonable expenses related to patient care. *See National Medical Enterprises, Inc. v. United States ("NME")*, 11 Cl.Ct. 329 (1986). The Secretary did not appeal.

In the present action, NME, on behalf of the three subsidiaries involved in the Claims Court judgment and fifteen additional subsidiaries, claimed reimbursement

for stock maintenance costs incurred by NME from fiscal 1974 to 1979. After an agency review process, the Secretary held that stock maintenance costs were incurred primarily for the benefit of present and future stockholders, not Medicare patients, and thus were not "reasonable costs" related to patient care under the Medicare Act. The Secretary also found that denial of reimbursement was consistent with the agency's Provider Reimbursement Manual ("PRM") §§ 2150.2B, 2134.9 [1] interpreting the Act. According to the manual:

> The following types of costs relevant to the proprietary and equity interest of the stock holders, but not related to patient care, are excluded from allowable costs: Costs incurred primarily for the benefit of stockholders or other investors, including but not limited to, the costs of stockholders' annual reports and newsletters, annual meetings, mailing of proxies, stock transfer agent fees, stock exchange registration fees, stock broker and investment analysis, and accounting and legal fees for consolidating statements for SEC purposes.

PRM § 2134.9.

The district court granted summary judgment for NME on the ground that the Secretary's decision lacked a rational basis. Stock maintenance costs, the court concluded, were necessarily incurred in securing equity financing for the provision of patient services. Moreover, the court found that stock maintenance costs were indistinguishable from other costs, such as debt financing, that were reimbursed. Accordingly, the district court ruled that the Secretary's disallowance of stock maintenance costs had no rational basis. Because we conclude, on the contrary, that the Secretary's decision does rest on a rational basis, we reverse the district court's judgment.

## II

■ Before addressing the merits of this action, we consider NME's claim that the Secretary is collaterally estopped from re-

---

**1.** The Secretary issued an interpretation of the Act in January 1973, *see* PRM § 2150.2B, and August 1973, *see* PRM § 2134.9. Both provisions exclude stockholders servicing costs from reimbursement under the Act.

litigating the stock maintenance cost issue because NME or its privies already successfully litigated the issue in the previous Claims Court action. *See NME*, 11 Cl.Ct. at 329. Neither party disputes the well-established rule that nonmutual offensive collateral estoppel[2] cannot be asserted against the government. *See United States v. Mendoza*, 464 U.S. 154, 159–60, 104 S.Ct. 568, 571–72, 78 L.Ed.2d 379 (1984). At issue, only, is whether mutuality exists, allowing NME the use of collateral estoppel. We hold that it does not.

The Secretary claims that mutuality is lacking because, although NME was the primary plaintiff in the Claims Court action, it is not the proper plaintiff in the case at bar. *See* Appellant's Reply Brief at 3–12. The Secretary points to 42 U.S.C. § 1395*oo* (f)(1), which stipulates that only "providers" of patient services may seek judicial review of agency decisions.[3] Drawing on a statutory definition of "provider" in 42 U.S.C. § 1395x(u)[4], the Secretary argues that NME, as the parent corporation, lacks standing to sue. *See* Appellant's Reply Brief at 3–12. NME counters that as the owner and home office of the subsidiaries, it is the appropriate party and contends that hospital owners "routinely" are named as plaintiffs in Medicare reimbursement suits. *See* Appellee's Brief at 15 n. 3; Appellee's Reply Brief at 1–5.

We need not decide whether, and under what circumstances, a parent corporation may seek judicial review under the Medicare Act. Because this lawsuit is grounded on the claims of eighteen wholly-owned subsidiaries—fifteen of which were not involved in the prior action—we conclude that mutuality is lacking, whether or not NME is considered a proper plaintiff. The facts of this case are that the eighteen

providers, not NME, are the primary plaintiffs in this dispute. As wholly-owned subsidiaries, these providers contract with the Secretary to provide patient services, receive regular payment and submit annual cost reports showing the expenses incurred during the fiscal year and the appropriate portion of those costs to be allocated to the Medicare program. Allowing a home office to establish mutuality merely by holding itself out as the "representative" of multiple subsidiaries would open the door for home offices with providers in multiple states to secure a favorable judgment in one circuit, then bind the government to that judgment in other circuits. Such a result would effectively freeze the law among circuits—a result explicitly disfavored by the Supreme Court in *Mendoza*, 464 U.S. at 160, 104 S.Ct. at 572 (noting that nonmutual collateral estoppel against the government "would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue."). *See also American Medical Int'l, Inc. v. Secretary of HEW ("AMI")*, 677 F.2d 118, 124 (D.C.Cir.1981) (holding that subsidiary providers that were not parties to a previous Medicare reimbursement suit could not use collateral estoppel against the government).

We also reject NME's contention that even if the parties in the disputed actions were different, collateral estoppel is still appropriate because NME and the fifteen subsidiaries that were not involved in the Claims Court action were in privity with each other. Whatever relationship exists between NME and its offspring is not sufficient to override the important values limiting the use of collateral estoppel. As courts have long recognized, collateral es-

---

**2.** "Offensive" collateral estoppel refers to the situation where a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against the same or a different party. *See Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 n. 4, 99 S.Ct. 645, 649 n. 4, 58 L.Ed.2d 552 (1979).

**3.** This section provides, in relevant part: "Providers shall have the right to obtain judicial

review of any final decision by the Board, or of any reversal ... by the Secretary by a civil action commenced within 60 days...." 42 U.S.C. § 1395*oo* (f)(1) (1988).

**4.** The section states that "[t]he term 'provider of services' means a hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, hospice program, or, ... a fund."

toppel is inappropriate where, as here, it would be "unfair" to the defendant, *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979), or where "applying preclusion [would] give one person a favored position in current administration of the law," *AMI,* 677 F.2d at 124 (quoting Restatement (Second) of Judgments § 68.1 at 33 (Tent.Draft No. 4, 1977)). Courts of appeals consistently have denied providers Medicare reimbursement for stock maintenance costs. *See AMI,* 677 F.2d at 124; *Humana, Inc. v. Heckler,* 758 F.2d 696, 700 (D.C.Cir.1985), *cert. denied,* 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986); *Sun Towers, Inc. v. Heckler,* 725 F.2d 315, 327 (5th Cir.), *cert. denied,* 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984). In addition to creating inconsistency among the circuits, allowing the subsidiaries in the present case to be reimbursed would unduly privilege them vis-a-vis providers in similar circumstances. We see no reason to countenance such disparity. We therefore deny NME the benefit of collateral estoppel.

## III

■ Turning to the merits of the case, we hold that the Secretary's decision to deny reimbursement for stock maintenance costs rested on a rational basis. Pursuant to Congressional directives, the Secretary is entitled to deny the subsidiaries reimbursement where such costs are not "reasonably related to patient care" or are "unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A) (1988). Judicial deference to an agency determination is particularly important where, as here, Congress has vested broad discretion in an agency to interpret a statute, *see AMI,* 466 F.Supp. 605, 611 (D.D.C.1979), *aff'd,* 677 F.2d 118 (D.C.Cir.1981), and the implementing regulations are highly complex, *see Bedford Medical Center v. Heckler,* 766 F.2d 321, 323 (7th Cir.1985) ("the interpretations of regulations issued pursuant to a statute, especially a statute as complex as the Medicare Act, are entitled to considerable deference."). On review, we may not overturn the Secretary's decision unless it is "arbi-

trary, capricious, an abuse of discretion, or not otherwise in accordance with law." Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A) (1988); *see also* 42 U.S.C. § 1395oo (f)(1) (1988) (explicitly incorporating the APA's standard of review into the Medicare Act). On these terms, we can find no basis for overturning the Secretary's decision.

Although stock maintenance programs may influence the corporate form, they have little bearing on its substance, the provision of patient services. *See, e.g., Humana, Inc.,* 758 F.2d at 700 (finding stock maintenance costs unnecessary for the provision of patient services); *Sun Towers, Inc.,* 725 F.2d at 327 (same); *AMI,* 466 F.Supp. at 613 (stating that although "[s]tock maintenance costs are necessary for a corporation to exist ... medical service can be provided without the corporate form").

As other circuits have recognized, stock maintenance programs are directed primarily at present and future stockholders, rather than at the provision or improvement of patient services. As the Secretary points out, costs associated with SEC filings provide prospective or current shareholders with a corporation's financial condition before they purchase, sell or retain their stock. Likewise, stockholders meetings and reports inform such shareholders about a corporation's financial condition. Although such programs are essential to shareholders, their "relationship to the provision of health care is too remote to allow them to be considered reasonable costs necessary to providing that care." *AMI,* 466 F.Supp. at 613 (footnote omitted). Under these conditions, it was reasonable for the Secretary to deny the subsidiaries reimbursement.

We reject NME's claim that because hospital service providers are required by state and federal law to incur stock maintenance costs, such costs are "necessary and proper" costs within the meaning of 42 C.F.R. § 405.451. As the *Sun Towers* court noted, "even necessary business expenses must also be necessary to patient care in order to be reimbursed under Medicare." 725 F.2d at 328. It is irrelevant that the Internal Revenue Service or other federal

agencies treat stock maintenance costs as reimbursable business expenses. Medicare reimburses only those business expenses reasonably related to patient care.

Nor is it probative, as NME contends, that generally accepted accounting principles include stock maintenance costs in a corporate provider's allowable general and administrative costs. Such procedures promote uniform recordkeeping; they do not prescribe reimbursable costs. *See AMI,* 466 F.Supp. at 623–24 (noting that the "regulation is directed at the type of financial data and reports required of providers; it is not a regulation affecting the substantive provisions of the program as to what constitutes reimbursable costs.").

Moreover, as our circuit has noted, when generally accepted accounting practices "do not accurately reflect the cost of patient care, as opposed to the cost of running a business, the Secretary reserves the right to prescribe different accounting practices." *North Clackamas Community Hospital v. Harris,* 664 F.2d 701, 706 n. 16 (9th Cir.1980). Such principles support the Secretary's denial decision.

We also reject NME's claim that because Medicare reimburses debt financing costs, it is illegitimate for the Secretary to deny reimbursement for stock maintenance costs. Stock maintenance costs, NME argues, are simply an aspect of equity financing, indistinguishable from underwriting and other debt financing costs that are reimbursed. Although the district court grounded its opinion on this apparent inconsistency, we find such an argument unpersuasive. Interest and other borrowing costs are reimbursed under Medicare only when the loan is necessary and has a "purpose reasonably related to patient care." 42 C.F.R. § 405.419(b)(2)(ii) (1985) (redesignated as 42 C.F.R. § 413.153). As indicated previously, stock maintenance costs do not meet these criteria.

We likewise find invalid NME's claim that the Secretary's denial conflicts with a Medicare policy of attracting investment capital for purposes of encouraging corporate providers of Medicare services. Under 42 U.S.C. § 1395x(v)(1)(B), providers may receive a return-on-equity investment, a lump sum payment for the use of private capital in health care facilities. Although Congress could have allowed reimbursement for other expenses, it chose not to do so. As the district court in *AMI* noted, "[i]t is clear from the purpose behind the return on equity provision ..., its legislative history, and the provision itself that the return on equity capital provision cannot be used by plaintiffs to support the position that reasonable costs ... was meant to include costs for investment." 466 F.Supp. at 613.

Indeed, that Congress, in its numerous amendments to the Medicare Act, has never taken an action that conflicts with the agency's position may be seen as "persuasive evidence" that it does not object to the government's interpretation of the Act. *FDIC v. Philadelphia Gear Corp.,* 476 U.S. 426, 437, 106 S.Ct. 1931, 1932, 90 L.Ed.2d 428 (1986). Other courts consistently have respected the agency's Medicare reimbursement limits. *See AMI,* 466 F.Supp. at 613–14; *Sun Towers,* 725 F.2d at 329 n. 26.

Finally, we reject NME's claim that it is inconsistent for the agency to reimburse costs of meetings and annual reports for non-profit providers, while denying them for for-profit providers. Although the Medicare Act mandates that the Secretary treat for-profit and not-for-profit organizations equitably, *see* 42 C.F.R. § 413.5(b)(5) (1989), distinctions are permissible so long as they have a rational basis. *See Hospital Authority of Floyd County, Ga. v. Schweiker,* 522 F.Supp. 569, 575–76 (N.D. Ga.1981), *aff'd,* 707 F.2d 456 (11th Cir. 1983); *AMI,* 466 F.Supp. at 615. Differing treatment in the case at bar clearly is supportable. For-profit organizations primarily hold meetings and issue reports to aid shareholders and to attract investment that will increase returns. Non-profit organizations, by contrast, generally have no such financial motivation. To the contrary, as the *AMI* and *Sun Towers* courts recognized, their efforts primarily are aimed at providing improved medical care. *See Sun Towers,* 725 F.2d at 328; *AMI,* 466 F.Supp. at 615. It is thus reasonable for the agency to compensate only those expenses that are closely tied to the provision of patient services.

Because of the strong principles and precedents supporting the Secretary's decision, we find the district court's judgment invalid and hold that the Secretary's denial of stock maintenance costs rested on a rational basis.

## IV

■ We summarily reject NME's contention that the regulations implementing the Medicare Act, *see* PRM §§ 2150.2B, 2134.9, are invalid because they were not established pursuant to the rule-making procedures of the APA. Under 5 U.S.C. § 553(b)(A), the APA excludes from its procedures "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." The agency manual through which the Secretary excluded stock maintenance costs merely clarified those expenses necessary for or related to patient care. As such, it was exempt from APA requirements.

The judgment of the district court is REVERSED.